Good morning, Your Honors. May it please the Court, my name is Nancy Schwartz, and I represent the appellant, Ms. Dawn Guevara. Ms. Guevara was convicted of conspiracy to distribute methamphetamine after a two-day jury trial. Ms. Guevara was wrongfully convicted based upon preserved evidentiary and constitutional error that occurred during her trial. I raised two main issues on appeal. The first had to do with the admission of testimony from DEA Special Agent Zydack, who testified to both border crossing data as well as historical postal records. The second issue that I raised had to do with the admission of implicit statements from a non-testifying postal worker, which I say were admitted in violation of Ms. Guevara's right to constitutional right to confrontation. Sotomayor What was the testimony of the DEA agent with respect to postal records? Ms. Guevara When the DEA agent talked about the postal records, he was asked specifically to correlate. He said he correlated, there was a strong correlation of the border crossings of Don — Sotomayor Okay. So he testified that based on the testimony of somebody else, he could correlate the border crossings with the postal records. He didn't himself testify about the postal records, right? Ms. Guevara He did testify that based — well, he didn't specifically testify to the historical postal records. He actually testified before Inspector Tubbs did, and so it was implicit in what he was saying. Sotomayor That it will be established by somebody else's testimony what the postal records show. Ms. Guevara Right. Sotomayor And I can not correlate the — okay. That's what — I just didn't see him testifying about the postal records. Ms. Guevara So I didn't either. Thank you for that clarification. So don't we have to understand what Postal Inspector Tubbs did in order to understand whether there's a problem with this part of Zydak's testimony? Ms. Guevara Correct. Ms. Guevara Okay. So what was wrong with what Postal Inspector Tubbs testified? Ms. Tubbs Well, what Postal Inspector Tubbs did is he, in his discovery, he presented an Excel spreadsheet that showed the historical postal data of this particular residence. Ms. Guevara Can I stop you there to clarify? Because I couldn't figure this out. Ms. Tubbs I have it in the record, and it's marked as an exhibit. Was it admitted, the Excel spreadsheet? Ms. Guevara The Excel spreadsheet was not admitted as an exhibit. I attached it to my sentencing memorandum. Ms. Tubbs Okay. So we've got that, and that's the one — I don't know if there's more than one Excel spreadsheet.  Ms. Tubbs I just have the one — so it doesn't have the time column on it, does it? Ms. Guevara Correct. Ms. Tubbs Okay. So that was not admitted. So take it away. Continue. Ms. Guevara Right. Ms. Tubbs I just needed that. Okay. Ms. Guevara Well, in backing up, what happened is I had filed a pretrial motion, and so the judge ruled on all these issues at trial. And what the government did was say, well, I'm not going to admit these exhibits. I'll just go ahead and have my officer testify to the contents. Ms. Tubbs Right. I appreciate that. I thought that was true of both — all of your arguments, but it's a little unclear — you'd be surprised, doing what we do for a living, how tough it is sometimes to recreate the history. Ms. Guevara Sure. Ms. Tubbs So back to Postal Inspector Tubbs. He was on the stand, and he was asked about these historic postal records. And I think he established that the post office keeps just tracking data, if I can just sort of summarize this. And then he said a couple of times, this Excel spreadsheet comes to me. This information comes to me on an Excel spreadsheet. So I couldn't figure out whether he compiled it or just hit a button to print the Excel spreadsheet. And here's why. Here's the confusion, maybe for both of you. The Excel spreadsheet that we have in the record, which I now understand was not admitted, doesn't have the time entries on it. But his testimony makes pretty clear he had to go to another database and get the time entries and write them down where. It's not even a — where did those get recorded? Ms. Tubbs He said that he recorded those in his report. Ms. Guevara Only in his report? Ms. Tubbs Only in his report. Ms. Guevara Okay. I'm beginning to see your — okay, go ahead. Mr. Levin I'm still interested in this, just factually. Put aside the arguments on it for a second. Judge, Inspector Tubbs says we pulled something. We pulled — we pulled data from post office records. Nobody's contesting in this case that the post office records are business records. Ms. Tubbs Correct. Mr. Levin In other words, you're saying they should have actually introduced the business records rather than his testimony. But if he looked at the business records and derived information from them, why can't he testify about that? Ms. Tubbs What I argued before the trial court was that then that would be something that was observed by the officer and wouldn't fall under one of the exceptions. Mr. Levin Well, so if you asked a police officer what's in the Declaration of Independence and he went to Philly and read the Declaration of Independence and testified to it, would there be any problem with that? Ms. Tubbs How about a different hypothetical? How about a police officer that we see more commonly? A police officer, if you don't mind, Terry. Mr. Levin No, no. Ms. Tubbs A police officer gets on the stand and has a report, right? And that report's not going to be admitted. But it's not uncommon for the police officer to have the report or maybe you have to refer to it to refresh your recollection about a particular event or incident. But I think what we had here was a postal inspector. He's testifying. He's got his But I think there were 22 packages delivered to the niece's address.  Ms. Tubbs And he had to retrieve from somewhere else, from another database, 22 time entries, if I'm understanding correctly. And apparently he only wrote those in his report. So there's an objection in the record where he refers to his report and it sounded like he was referring to it. Again, we're not in the courtroom, so it's hard to recreate. I think the objection was that he was reading from his report rather than testifying from memory or, you know, this is very detailed information about these 22 time entries, four of which wind up being important at trial. Is that the problem, that he was reading too closely from his report? Ms. Levin Well, and as to the time, he only put the time of those four packages that then ended up being videos. Ms. Tubbs I understand that. We understand that. That's why I referenced his 22, but it would be a lot to go from memory. Ms. Levin Correct. Ms. Tubbs So he's got apparently, I don't know if he's got 22 or more in his report, but he winds up testifying as to four and the objection in the transcript is objection, Your Honor, he's reading from his report. And I'm trying to figure out if I'm correctly understanding what happened in the courtroom. Please feel free, both of you, when it's your turn, to correct me if I misunderstand what happened. Because I think Judge Hurwitz and I are both grappling with just the facts at this point. Judge Hurwitz Yes. Ms. Tubbs What happened? Ms. Levin What I recall is that he was reading from his report as far as the information that was in that. Judge Kagan Let's set that aside for a second, because as Judge Kristen says, sometimes people have to refresh their recollection or the report wasn't introduced, as I understand it. So I'm trying to figure out whether or not Ms. Levin That's right, right? The report was not introduced either? Ms. Tubbs No. Ms. Levin Okay, go ahead. Judge Kagan So let me just pose this. I don't want to pose this as hypothetical, but I just want to pose two possibilities. One is the inspector said, I checked the postal records, I checked the business records, and this is what I learned. And I put it in my report, and now I'm telling you about this. Or it's possible that he said, I asked somebody else to tell me what happened. And he says we here, so that would seem to include him. So I'm trying to figure out whether the record establishes what he did to get this information. Because from my perspective, you don't have to introduce the public record as long as somebody looks at a public record and says that's what it says. So can you help me with that? Ms. Tubbs He didn't say how he got that record. He said that he retrieved it, and it came to him in an Excel spreadsheet is what he specifically said. Ms. Kagan To be clear for our record here, you're now talking about the historic postal records, not the text record. Judge Kagan Correct. Ms. Tubbs Okay. Ms. Kagan This is true of the historical postal records. Judge Kagan Yes. And again, my question is, did he look at, did he actually observe the historical postal records, or did he just say to somebody, here's how I know we do this. You do this and you generate a spreadsheet or something like that. Ms. Tubbs You know, I'm not positive which way he went with that. Judge Kagan Neither am I reading the record. That's why I ask you. Ms. Tubbs My understanding is that he said, he testified that it comes to me in an Excel spreadsheet, and so someone else was generating that information and sending it to him. Judge Kagan But he does say, we pulled the records. Those are the exact language he said. He said, we pulled the records, and then something comes to me in an Excel spreadsheet. So I'm trying to figure out what records he pulled. Ms. Tubbs Well, and I wasn't as concerned about the historical postal records as I was them being in conjunction with the text records. Ms. Kagan So if we skip step one for a minute, let's say the historic postal records that were printed out, that Excel spreadsheet as printed as we have it in the record, let's say for a minute that that's a public record. Ms. Tubbs Okay. Ms. Kagan Now, if you go to step two, that, because that Excel spreadsheet does not have the timestamp.  Ms. Kagan And the timestamp says that's what's critical, because that's what ties everything to the lobby, post office lobby videos.  Ms. Kagan Okay. Ms. Tubbs So he very clearly testifies he has to go to another database to get the time entries.  Ms. Tubbs And I'm assuming he did that himself. I think that the transcript says that. Ms. Kagan And you've explained then he writes those down, but not on the Excel spreadsheet. He wrote those down in his report? Ms. Tubbs Correct. Ms. Kagan And you had Ms. Tubbs Those are the four dates. Ms. Kagan Okay. And you have his report? Ms. Tubbs I had his report. Ms. Kagan It wasn't introduced? Ms. Tubbs It wasn't introduced. Ms. Kagan Okay. And so your objection about this next bit of information is, what's your evidentiary objection as to this? Ms. Tubbs Well, that in combination that he didn't provide the proper foundation for any of that. You know, prior to trial, the government made an offer of proof, basically, but then when it came time to testify at trial, the court had already ruled that this was coming in. And so, you know, based on that, the government then didn't offer a proper foundation for any of it. Ms. Kagan Right. So was your objection at trial was hearsay and foundation or hearsay and authentication? Or what was your objection at trial? Ms. Tubbs Well, and that got very complicated. Obviously, it was hearsay, authentication. Best evidence came out as far as the text records. Ms. Kagan So I'm not talking about text records yet. Ms. Tubbs Sure. Ms. Kagan Because I'm trying really hard to keep these straight. So far, I'm just still at the historic postal records. What was your objection to those? Ms. Tubbs That it hadn't been properly authenticated. They hadn't provided me the information prior to court as far as any of that timing. I wasn't able to go to the database and look at it myself. Ms. Kagan I think it's a hearsay objection in the transcript, isn't it? Ms. Tubbs Correct. Ms. Kagan Okay. Is there more that you want to say about the historic postal records before we go on to the text records? Ms. Tubbs No. Ms. Kagan Okay. What about the text records? Ms. Tubbs The text records showed the border crossing data. And again, this was something that DEA Special Agent Zydak testified that he retrieved, but then when he was questioned about that at trial, he then admitted that no, he didn't retrieve it. He actually looked over the shoulder of a Border Patrol agent who was assigned to the office, and that was the person that retrieved. That wasn't the representation made previously as far as what was available to the DEA agent. And so the judge based her decision on admitting those records based on the fact that the DEA agent had access to that when, in fact, he didn't. That was a Border Patrol agent that did that. And so those should not have been admitted. Ms. Kagan So what's your objection to that, to the introduction of the text records? Ms. Tubbs Well, I had objected. This was confusing because prior to trial I didn't know that what they were going to do was say, well, we're just going to have the officer testify to the records instead of introducing this as an exhibit. Ms. Kagan Can I stop you there because I might, again, I'm piecing things together. It seems that these were marked as an exhibit. Ms. Tubbs Correct. Ms. Kagan So prior to trial you objected because they didn't have the right witness. Ms. Tubbs Right. Ms. Kagan And then I think, I'm paraphrasing, and then I think the government said, okay, we're going to get these in through a different witness. Ms. Tubbs No, they were always going to be bringing those in through the DEA agent. Ms. Kagan I see. So when you objected before trial the government responded with what, that they were going to bring it in through just the testimony and not the exhibit? Ms. Tubbs Correct. Ms. Kagan I see. Ms. Tubbs In circumvention of the best evidence rule. Ms. Kagan Got it.  Ms. Tubbs I need to reserve the rest of my argument. Ms. Kagan We'll give you a little more time. We took an awful lot of it with just trying to get the facts out. Judge Hurwitz, do you have any more questions for Judge Fletcher at this point? Judge Hurwitz I'm okay for now. Ms. Kagan Okay. We'll be talking again with you shortly. Ms. Tubbs All right. Thank you. Ms. Kagan Let's hear from the government. Morning.  May it please the Court, Tim Tarka for the District of Montana on behalf of the United States. So I'll go directly to some of these factual questions. So the place to look with respect to the postal data is at excerpts of the record page 352 and 353. There the agent testified that he pulled the historic or He says we pulled. We pulled. Yep, yep. He did say he said we pulled the historic mailing records related to a specific address. And that comes to me on an Excel spreadsheet. The best evidence rule is clear that exports, printouts or exports from a database are, do constitute originals. But just so I can be really clear, this is because an officer, I'll say in the field, had contacted the postal inspector and wanted a record of all the packages delivered to that address, the nieces address, right? That's the starting point? Correct. Okay. And so that's what they pulled. And there's no doubt in this case that the public records will show for a time period all the packages delivered to a specific address. And I don't think your friend contests that. The question is whether this witness, what did this witness do, I suppose is the question. Yeah. So I think he says we there, but at least in the end, of course, this court reviews for abuse of discretion, admissions of evidence at this point. But I think the logical reading of that was that he pulled those records on an Excel spreadsheet. Except that he says a couple times this comes to me on an Excel spreadsheet. Hence, you know, coupling that with we pulled, it's just difficult to know. And the document itself isn't, I appreciate that your briefing makes clear you're not relying on anything being self-authenticating, but it's not a printout that sort of has a title and explains to us, announces itself to us. Correct. So it's a little bit wobbly right there. Though I do think it is clear, so again, as you pointed out, this is actually included in excerpts of the record, page 471 and 472. It has the full, I think it is clear that it is an export as opposed to a filled in spreadsheet, given the kind of information that's included in there. So what you're saying is, and it wasn't admitted into evidence. It was not. But that it falls within the public records exception for somebody to pull a public record and then to use a program to synthesize that record into a spreadsheet that aids his testimony?  Correct. And then he does testify very clearly at excerpts of the record, page 353, that he went and correlated those with the tracking numbers to find the time stamps for those particular packages, and that's what he used to obtain the videos. So where did he write down that? He says he has to look at a second database to get the times. And on page 472, which is the second page of the spreadsheet, there's his handwritten numbers. But I don't think they're times. No, I think it's just identified 1 through 22. Okay, right. That's what I thought too. So the times are written only in his report, according to opposing counsel? That's correct. Only in his report, not in the printed spreadsheet. Okay, so thank you. So do I understand correctly, then, the objection in the courtroom was that he was reading, opposing counsel thought, reading from his report as opposed to testifying? Well, the ---- Or do I misunderstand the nature of what was happening there? It isn't. The objection at this point, the defense just asked for a continuing objection because defense had already made the authentication objections earlier. So it's not clear precisely what was being the contours of that objection. You said this was ---- you were offering this as a public record, right? This is a public record, I think, with respect to the time stamps. It doesn't even need to be a public record because I think that is not hearsay because it is a machine statement. Okay, so hold on. You didn't ---- this wasn't admitted. You're admitting the testimony, right? Correct. And I thought that's why the objection was that he was reading from his report. And I'm just trying to understand that. I believe the objection was so. Pre-trial, the court did the analysis about the government being able to bring in these summary records through Rule 1006. Okay, but you didn't offer it as a summary record, as my understanding is you're offering an oral summary. So, yes, and summary testimony under 1006 under this Court's precedent can be either oral or written. Right. But what's important with respect to the time stamps, again, as I say, for one thing, they don't fall within a hearsay exception anyway because they are machine generated. But also they were only used, the only purpose ---- I'm not sure they were machine generated. That's part of the problem that she's got. He had to look elsewhere and pull them over and write them down. So that's the room for human error. I think that's the basis of her objection, sir. It's not like somebody pushed a button and that printed out. Correct. Okay. I mean they are not, they're machine, the originals were machine generated. I appreciate that. So the originals would not be ---- And part of her objection is that the originals were never produced or made available to her. I'm not trying to be pedantic. I'm trying to understand. No, no, no, that's absolutely right. Okay. And that is, I think that is her objection. What that fails to recognize is the contents of those records, for best evidence purposes, the contents of the timestamps were not admitted to prove their contents. It was an investigatory step to obtaining the videos, and of course the videos are the best evidence of what the videos show. Did the government need any of the postal records to obtain this conviction? They had testimony of the niece, testimony of the confidential informant, testimony of the cooperating, or of a police officer, right, who did I think a total of seven controlled buys? Correct. Okay. So I didn't want you to think I lost sight of that, but I am having trouble with the government's responses about these evidentiary objections. Judge Hurwitz has a question. No, and I was going to add to that, and at least two videos that are not objected to showing the defendant in the post office at the time of alleged offenses. And those correlate to border crossings that are tied to Guevara's passport. So, again, I want to go back to this question that Judge Krista was asking. So let's assume for a moment that the agent's testimony shouldn't have been accepted for the truth of the matter, which is that this is when packages were mailed, et cetera, but it's just simply viewed as him saying, and then I went this is what I did in order to determine what time period I should look for for the videos. That is absolutely correct. It is especially true with respect to the time stamps. If that information was included, that was included by error. Let me ask the question differently. Even if the evidence should not have been admitted for the truth of the matter, it could have been admitted to establish the steps that the agent took to get the videos. And under that circumstance, isn't any error harmless? Because it's really the videos that show that she was doing this that are the critical thing. That is absolutely correct. The videos themselves are the best evidence of what the videos show. And so the time stamps were merely an investigative step along that way. The question about whether or not if none of the postal records were included would be a closer case. You have the niece saying that she and all of the texts are now not objected to. On appeal, we don't have that. So you have the niece, all the texts between the defendant and the niece, including how much to charge for the methamphetamine. Correct. We have identification of the defendant by certainly by the niece. There's the confidential informant. There's the initial and then officers at Martian who conducted a total of seven controlled buys. Yeah. And a recording. It is over. And a recording. I don't mean to say that I think the evidence is overwhelming there. My point is I also don't think that there's any question that the postal records come in in terms of that the packages were mailed from San Ysidro to— I have some problems with your evidence, even under the abuse of discretion standard, to be candid with you. And I don't know how we—we haven't talked about the text records yet, for example. How would that be permissible? So the agent testified. This is an excerpt from the record 309. The agent testified using resources we had. I checked the post— But, counsel, they have to be authenticated. And he's not—he doesn't work for Customs and Border Patrol or whatever it is, so it just seems to be really loose testimony right there. What am I missing? Well, and I think, and I would note that Judge Hurwitz mentioned earlier, these are not business records that would need to be authenticated by a custodian. These are public records, and 901B7 is clear that public records just have to be testified to that they are stored in the place where these public records are kept. So who offered that testimony? Agent Martin. Excuse me, Agent Swidek. And that is an excerpt from the record 309. Who doesn't work for that agency, right? Who does not work for that agency? He does not work for Border Patrol, but he does have access to the database, and I would recommend the Court's attention on that point to excerpts from the record page 123. What was his access? Originally, I think he told the district court that he had access. I think upon cross-examination, it turns out he had somebody else from Border Patrol access them, and he looked over their shoulder or something? No, Your Honor. What he said was consistent. On page 309, he says, using resources that, I'll read it specifically. Oh, I read the page about the resources. So he says, utilizing some of the resources that we had, I checked the border crossings. Then on the next page, and so that's, I think it is entirely consistent with that, he says, when asked about the source of the border crossing data, he says, I was assigned here in the Billings office. Another one of the people that had, that were assigned there was from Border Patrol having access to border crossing activity. I think that goes to the using resources we had part of that first sentence and doesn't contradict at all the fact that he said, I checked the border crossings. I understand your argument. Can you address the recording and the, as I understand it, there were also telephone text messages exchanged that were introduced into evidence. How did you authenticate that they came from the defendant? How did you prove that they came from the defendant? Oh, well, the text messages that we got either came from the niece's phone, which was seized when she was arrested, or from the undercover agent. Okay, and as to those, how did you, how was it established that those messages came, did the niece say that they came from? Okay, how about the recording? So, the videos or the? The telephone recording. That was recorded by the agent. How do we know the person on the other end was the defendant? Well, we know it was from the phone that she was, that was associated with her name. It's the same number that was associated with her name in the niece's text, and she identifies herself as Dawn on the call. So the niece's phone. Because they're not objected to at trial. Those were not objected to. The niece's phone was seized at the time of her arrest. She allowed them to search the phone. That phone included, I think, text showing like baby pictures, family, so it was very clear that this was Aunt Dawn, I believe, and the same phone number that the niece was using to communicate with her aunt was the one that the undercover agent used to communicate with the aunt. Is that right, the defendant? Correct, and in the, she identifies, in that conversation, she identifies herself as Dawn and she refers to Chesmore as her niece. I think her e-mail address has her name in it. I think her e-mail address has her name. There's an iCloud account that it was Dawn MO 1980, which, again, corroborates that. And I would also point out that Collinsworth, the CI, was connected to Guevara not through the niece but through her brother who hooked him up. So this couldn't just be a conspiracy all created by Chesmore. We've taken you almost at the end of your time. Judge Hurwitz, Judge Fletcher, I don't think we have anything further, but thank you for your patience with our questions. No, thank you. I was not even able to get to the second issue that I had raised as far as the confrontation clause, which obviously is a stronger argument based on the standard of review. I have a question about that. We can do it quickly. And I get to say that we have more time if we need it, so you can relax. But on that, at this point in the process, by the time the postal inspector wanted to look at the videos, I think he was able to access two, not able to access two others for some technological reason. But he contacted another person to pull up those videos for him, and I'm summarizing them, of course. But I think he was able to say, I need the videos for, and it gave him the date and time. And in this way, I think it seems to me that your case really differs from the confrontation clause argument that you try to analogize to from, is it the Brooks case? Right. He also gave the tracking number. Right. So how is there any room for us to treat the response as a testimonial statement in the same way that we did in Brooks? Because that was the implicit statement from the agent back, the person who got those videos back, it was the implicit statement back that here's the person. He wanted him to send him the suspect packages being mailed with a certain tracking number, certain time, to show the sender of the package. And so when he sent those back, he was implicitly saying, here she is, here's the sender of those two packages. We have case law where a postal inspector, again, I'm going to summarize, but a postal inspector is following a suspect, and he calls somebody inside the post office and basically says, my guy just went in there, my suspect just went in there, I want to know, intercept that package, basically, that he's just mailed. But we don't know, as the reader of that case, how many guys just walked into the post office wearing a blue shirt. Right. So in that way, it seems to me there's a much wider margin for error and really an opportunity for fertile cross-examination at that link. And it's a devastatingly important link because that package, of course, winds up having, I think, marijuana in it. Okay. In your case, I think that's what you're analogizing to, but the facts here are that the postal inspector called for assistance retrieving a very specific set of two videos by date and by time. So I don't see that there's room to argue that the response has the same testimonial characteristic. In other words, it's just like asking a librarian to pick a particular book off the shelf. Right. The implicit statements that he was saying was that this was of the suspect packages when he sent those to that. No, it's a statement that this is what was happening in the lobby at that date and time. When he sent those packages to the postal inspector, he's saying this is the suspect packages with the tracking number that he told me to look up. Oh, forgive me. Are you talking about Brooks now or are you talking about our case? I'm talking about my case. Okay. But in our case here that we have at VAR, I think the direction was not, hey, go get a video of my suspect. It was a request for two very specific videos of the lobby on a particular date and time. Well, and what I'm going off of is just what the officer put in his report, which I also put in my trial brief that said, I want you to go get the suspect packages and to include the sender of those suspects. Was the report introduced into evidence? The report wasn't introduced into evidence, but certainly when he testified about the videos, that's what he said happened. Well, so I'm trying to figure out what you're making a confrontation cause objection. So I'm trying to figure out what out-of-court, who made an out-of-court statement here to which you object. It was the out-of-court postal surveillance specialist that made the statement. He made two implicit statements. Well, there's no statement. What you're saying is that he implicitly adopted the statement made by somebody who you did have the opportunity to cross-examine. The two implicit statements that I said he said were that here are the videos of the suspect packages, which show who mailed those packages. And then also he said the packages in those two videos, even though you can't see it, has the same tracking number as does. But you agree he didn't say any of those things? No, no. So what you're saying is that he was adopting a statement made by the witness who was in court. There's no statement at all by this person that was introduced. Right. You're saying that his response by sending the videos to the testifying witness was an implicit statement that they met the description that the testifying witness gave. Right. And then the government ---- Okay. I understand that now. And then the government specifically asked Inspector Tubbs, okay, and is that the package that was sent using the tracking number you received? Yes. Safe to assume the person mailing the package is the person who wants it mailed? Yes. And so he's actually ---- But those are not confrontation clause problems. Your confrontation clause argument is that the person who retrieved these videos somehow was making an implicit statement by retrieving them. Isn't that your argument? Yes, based on the fact that he was using information that wasn't in that video. There's only the time in that video. And even then, you could cross-examine that person about that because the video displays a UTC code time stamp. It's not even the same time stamp that was in the officer's report. We've taken you well over your time. Thank you. Thank you for your advocacy, both of you. Thank you. We're going to take this under advisement and stand in recess for the day. All rise. The court stands adjourned until tomorrow morning. Thank you.
judges: FLETCHER, CHRISTEN, HURWITZ